**CHICKERING v. COMMISSIONER OF INTERNAL REVENUE.**
**No. 3618.**

Circuit Court of Appeals, First Circuit.
March 13, 1941.

F. H. Nash, of Boston, Mass. (Brooks Potter, of Boston, Mass., on the brief), for petitioner for review.

Louise Foster, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, Sp. Asst. to Atty. Gen., on the brief), for the Commissioner.

Before MAGRUDER and MAHONEY, Circuit Judges, and HARTIGAN, District Judge.

MAGRUDER, Circuit Judge.

This is an appeal from a decision of the Board of Tax Appeals determining a deficiency in estate taxes of the decedent, Mrs. John Chickering. The sole question presented is whether the decedent's interest in a trust fund should have been included in her gross estate under § 302(d) of the Revenue Act of 1926, 44 Stat. 9, 71, 26 U.S.C.A.Int.Rev.Acts, page 228.

The decedent's father, William A. Russell, died intestate in 1899. In 1901 his widow and five children created the William A. Russell Trust and transferred to it the bulk of Mr. Russell's estate. Each donor became a beneficiary of the trust substantially in proportion as he or she shared in the estate under the Massachusetts laws of intestacy. The trust was to continue for the full period of perpetuities except that at any time the surviving children of William A. Russell, the eldest descendant of any deceased child, and Mrs. William A. Russell if living, might by unanimous consent modify, terminate or revoke the trust. In general, on the death of each of the donors his or her share of the income became payable to the issue of such donor per stirpes, subject to life estates in favor of surviving spouses. Upon termination of the trust, the corpus was to be distributed among the children and more remote issue of William A. Russell in proportion as they were then entitled to share in the income. However, the decedent (in common with the other donors) retained a limited power to depart from this somewhat rigid scheme of devolution by apportioning income and corpus as she saw fit among her children or disinheriting them wholly or partially in favor of the trust. A similar power was retained in regard to her spouse's life estate, which she could cut down, or extinguish altogether, in favor of her children or of the trust. The chief provisions of Section Eighth, granting this power, are set forth in the margin.[1] By amendment in 1910 this power was made exercisable by deed only.

---

[1] "Eighth. (Clause 1.) Any child of the Intestate who may die leaving issue living and whether leaving a surviving wife or husband or not may by will duly executed appoint and apportion his or her share of income with accretions that may fall into the same as he or she may think fit among his or her issue and surviving husband or wife, if any, to be paid to them respectively for and during their respective lives. Or such testator may cut off or diminish in whole or in part the share of income which any issue or husbands or wives respectively of such issue would otherwise have received under this instrument. Any part so cut off and not otherwise divided or apportioned by such will among the issue, husband, or wife of such testator, shall be distributed among the widow of the Intestate and his then surviving children and the issue of any deceased child of the Intestate (other than the issue of a testator) by right of representation in the manner and proportion provided in Section Seventh, clause 3.

"(Clause 2.) Any son of the Intestate who may die leaving a wife but no issue, and any daughter of the Intestate who may die leaving a husband but no issue may by will duly executed diminish or cut off in whole or in part the share of income which such wife or husband would otherwise receive under this instrument, and the portion so cut off shall be distributed as under Section Seventh, clause 3.

"(Clause 3). Any son or daughter of the Intestate who may die leaving issue living may by his or her last will duly executed apportion his or her share of the *principal* of the trust fund among his or her children or issue who may be living at the time of any distribution of principal, or cut off or diminish in whole or in part the share which any of such issue would otherwise receive under the provisions of this instrument. The part of the principal so cut off, if not otherwise disposed of and given by such will to others of the issue of such testator, shall be distributed among the widow of the Intestate and his then surviving children and the issue of any deceased child of the Intestate (other than the issue of such testator) who may be living at the time of any distribution of principal, by right of representation in the proportion and manner provided in Section Seventh, clause 3.

"For the purpose of making appointments of principal by will under Section Eighth, it shall be taken and assumed

Mrs. Chickering died in 1935, leaving one child, a son. She had survived her husband and therefore at the time of her death her power over the devolution of her interest amounted to a power by deed to cut her son off from the whole or any part of her share of the income and principal; and the amount so cut off would then automatically be subject to distribution among the other beneficiaries in accordance with the other provisions of the trust deed. She had never exercised the power, however, and so her entire beneficial interest passed to the son. In computing her estate tax, the Commissioner included in her gross estate 13⅓% of the value of the William A. Russell Trust, representing the proportion contributed by Mrs. Chickering in 1901 at the time of the trust's creation. The Board of Tax Appeals upheld this determination on the ground that Mrs. Chickering had retained a power, exercisable by her alone, to "alter, amend, or revoke" within the meaning of § 302(d)[2] of the Revenue Act of 1926. From this decision the taxpayer appeals on the ground that § 302(d) is inapplicable or, if applicable, unconstitutional in that it attempts retroactively to tax a transfer completed before its passage.

 While the power retained by the decedent is phrased in terms of disinheritance, we can see no difference between this and a more conventionally phrased special power of appointment. As a practical matter Mrs. Chickering could choose between two possible objects—her son or the William A. Russell Trust—and could apportion the income and principal between them in any proportion she chose to the extent

of complete exclusion of either. In cases involving equally narrow special powers, courts have frequently held that the enjoyment of the property in question was subject to a power in the transferor to "alter, amend, or revoke" within the purview of § 302(d). Commissioner v. Chase National Bank, 2 Cir., 82 F.2d 157, certiorari denied, 299 U.S. 552, 57 S.Ct. 15, 81 L.Ed. 407; Hoblitzelle v. United States, Ct.Cl., 3 F.Supp. 331; Holderness v. Commissioner, 4 Cir., 86 F.2d 137. We have no doubt, therefore, that had the Russell Trust been created after the enactment of § 302(d), the proportion of the trust contributed by Mrs. Chickering would be includable in her gross estate.

The present trust was created in 1901, however, and until 1924 the estate tax contained no provision analogous to § 302(d). It is certainly true that in some circumstances a section of the estate tax may be constitutionally applicable to trusts created after its enactment but not to trusts created prior thereto. Compare, e. g., Helvering v. City Bank Farmers Trust Co., 296 U.S. 85, 56 S.Ct. 70, 80 L.Ed. 62, with Mackay v. Commissioner, 2 Cir., 94 F.2d 558, and Commissioner v. Kaplan, 1 Cir., 102 F.2d 329. It is argued that long before the enactment of § 302(d) Mrs. Chickering had divested herself of all control of the trust property except for a closely circumscribed power of dubious monetary value; and that to tax this power at the full value of the property is in effect retroactively to tax a completed transfer.

 But the estate tax is not a direct tax upon the property; nor is it in a strict sense a tax upon a "transfer" of the prop-

---

that any child or issue of the Intestate entitled at his or her decease to the present enjoyment of a share of income, is owner of a like fractional share of the principal, and of a further share of principal corresponding to any accretions which may subsequently fall into such share of income, except as may be otherwise provided by will of an ancestor made in accordance with Section Eighth."

[2] "Sec. 302. The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated — * * *

"(d) To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, where the enjoyment thereof was subject

at the date of his death to any change through the exercise of a power, either by the decedent alone or in conjunction with any person, to alter, amend, or revoke, or where the decedent relinquished any such power in contemplation of his death, except in case of a bona fide sale for an adequate and full consideration in money or money's worth. * * *

"(h) Except as otherwise specifically provided therein subdivisions (b), (c), (d), (e), (f), and (g) of this section shall apply to the transfers, trusts, estates, interests, rights, powers, and relinquishment of powers, as severally enumerated and described therein, whether made, created, arising, existing, exercised, or relinquished before or after the enactment of this Act."

erty by the death of the decedent. It is an excise tax upon the happening of an event, namely, death, where the death brings about certain described changes in legal relationships affecting property. The value of the property so affected is merely used as a factor in the measurement of the excise tax. In the case at bar the death of Mrs. Chickering resulted in an enlargement or ripening of property rights in her son, for the death removed the possibility that the son's interest under the trust deed might be destroyed by an exercise of the reserved power held by his mother. The death was thus "the source of valuable assurance passing from the dead to the living." Porter v. Commissioner, 288 U.S. 436, 444, 53 S.Ct. 451, 454, 77 L.Ed. 880.

■ The nature of the tax is clearly described in Tyler v. United States, 281 U.S. 497, 502, 503, 50 S.Ct. 356, 358, 74 L.Ed. 991, 69 A.L.R. 758:

"A tax laid upon the happening of an event, as distinguished from its tangible fruits, is an indirect tax which Congress, in respect of some events not necessary now to be described more definitely, undoubtedly may impose. If the event is death and the result which is made the occasion of the tax is the bringing into being or the enlargement of property rights, and Congress chooses·to treat the tax imposed upon that result as a death duty, even though, strictly, in the absence of an expression of the legislative will, it might not thus be denominated, there is nothing in the Constitution which stands in the way.

"The question here, then, is,·not whether there has been, in the strict sense of that word, a 'transfer' of the property by the death of the decedent, or a receipt of it by right of succession, but whether the death has brought into being or ripened for the survivor, property rights of such character as to make appropriate the imposition of a tax upon that result (which Congress may call a transfer tax, a death duty or anything else it sees fit), to be measured, in whole or in part, by the value of such rights."

It cannot be said that the tax here imposed is retroactive in any objectionable sense. While the trust was created in 1901, long before Congress had enacted an estate tax, the tax is an excise upon an event occurring subsequent to the enactment of the tax law. A similar argument about retroactivity was unsuccessfully made in United States v. Jacobs, 306 U.S. 363, 59 S.Ct. 551, 83 L.Ed. 763. There certain real estate was conveyed in 1909 to a husband and wife as joint tenants. The property was acquired wholly by funds of the husband. The joint tenancy continued until the husband's death at which time the wife as survivor became the sole owner in fee. It was held that in calculating the estate tax payable by the deceased husband's estate the full value of the joint property should be included in the gross estate. The court said, at pages 366, 367 and 371 of 306 U.S., at page 553 of 59 S.Ct., 83 L.Ed. 763:

"But the tax was not levied on the 1909 transfer and was not retroactive. At decedent's death in 1924, ownership and beneficial rights in the property which had existed in both tenants jointly changed into the single ownership of the survivor. This change in ownership, attributable to the special character of joint tenancies, was made the occasion for an excise, to be measured by the value of the property in which the change of ownership occurred. Had the tenancy not been created, this survivorship and change of ownership would not have taken place, but the tax does not operate retroactively merely because some of the facts or conditions upon which its ·application depends came into being prior to the enactment of the tax. * * *

"This termination of a joint tenancy marked by a change in the nature of ownership of property was designated by Congress as an appropriate occasion for the imposition of a tax. Neither the amount of the tax nor its application to the survivor's change of status and ownership, was in any manner dependent upon the date of the joint tenancy's creation, whether before, or after, 1916. It is immaterial that Congress chose to measure the amount of the tax by a percentage of the total value of the property, rather than by a part, or by a set sum for each such change. The wisdom both of the tax and of its ·measurement was for Congress to determine."

In the Jacobs case the husband in 1909 had irretrievably conveyed to his wife as joint tenant a half interest in the property which she could freely alienate. The husband retained 'no power to cut his wife out of this interest, though of course if she should predecease him without having alienated her interest he would take the whole as survivor. Nevertheless upon the death of the husband in 1924 the whole value of the property was included in his

gross estate for the purpose of determining the estate tax. The case at bar is a much weaker one for the taxpayer in this respect, because Mrs. Chickering up to the moment of her death retained the power to alter the devolution of her whole share in the trust property. Her son could not be sure of getting anything until this power was extinguished by death.

While the Jacobs case did not involve § 302(d), it is an answer in principle to the constitutional argument now made as to the application of § 302(d) to a trust created in 1901 and the resulting inclusion in the decedent's gross estate of the whole value of the property rather than the value to decedent of the limited retained power over its devolution.

Porter v. Commissioner, 288 U.S. 436, 53 S.Ct. 451, 452, 77 L.Ed. 880, sanctioned the application of § 302(d) to a trust created by the decedent in 1918, wherein he transferred to a trust company certain bonds for the benefit of his daughter and her son, reserving the power to alter or modify the trusts in any manner except "in his own favor or in favor of his estate." It was argued that the decedent prior to the enactment of § 302(d) had "completely divested himself of title without power of revocation," and that "inclusion of the transfers in question would be to measure decedent's tax by property belonging to others." In answer, the court said (page 444 of 288 U.S., page 454 of 53 S.Ct., 77 L.Ed. 880):

"But the reservation here may not be ignored for, while subject to the specified limitation, it made the settlor dominant in respect of other dispositions of both corpus and income. His death terminated that control, ended the possibility of any change by him, and was, in respect of title to the property in question, the source of valuable assurance passing from the dead to the living. That is the event on which Congress based the inclusion of property so transferred in the gross estate as a step in the calculation to ascertain the amount of what in section 301 [26 U.S.C.A.Int.Rev. Acts, page 65] is called the net estate. Thus was reached what it reasonably might deem a substitute for testamentary disposition. United States v. Wells, 283 U.S. 102, 116, 51 S.Ct. 446, 75 L.Ed. 867. There is no doubt as to the power of Congress so to do."

Under the authority of the Porter case, it is now settled beyond doubt that where a donor created a trust before the passage of § 302(d), but retained a broad power over the eventual disposition of the property, the whole value of the corpus, upon his death, may constitutionally be included in his gross estate. Adriance v. Higgins, 2 Cir., 113 F.2d 1013; Cook v. Commissioner, 3 Cir., 66 F.2d 995; Dort v. Helvering, 63 App.D.C. 98, 69 F.2d 836.

The taxpayer urges that, while it may be proper to include the full value of the property over which the decedent had retained a broad power, such inclusion is improper in a case like the present where the power retained is so narrowly limited. The Porter case itself suggests that there may be powers of alteration so "slight or trivial" as not to fall within the scope of § 302(d), 288 U.S. at page 443, 53 S.Ct. at page 453, 77 L.Ed. 880, but a power to change the ultimate beneficiary, even though confined to a small class of objects, cannot be regarded either as "slight" or "trivial." In Commissioner v. Chase National Bank, 2 Cir., 82 F.2d 157, where the decedent in 1920 had created an irrevocable trust, reserving a power to alter the proportions in which her descendants should take the property, the court said (page 158 of 82 F.2d) that "The power she reserved was not to change the trust provisions in a trivial way, but went right to the heart of them and gave the decedent a substantial though qualified control over the trust property until her death."

The two cases upon which the taxpayer chiefly relies are clearly not in point. In both White v. Poor, 296 U.S. 98, 56 S.Ct. 66, 80 L.Ed. 80, and Helvering v. Helmholz, 296 U.S. 93, 56 S.Ct. 68, 80 L.Ed. 76, the taxpayers had retained powers, in trusts created prior to the enactment of the applicable section of the estate tax, which were exercisable only with the consent of persons adversely interested in such exercise. To tax on the basis of such a power would, the court held, be in effect retroactive since the decedents had parted with all real control. Here Mrs. Chickering's power was not circumscribed by any requirement of concurrence in its exercise. We think that whenever the grantor of a trust has retained the unfettered power to make so fundamental an alteration as a change of beneficiaries, the corpus of the trust is includable at death in his gross estate. Commissioner v. Chase National Bank, 2 Cir., 82 F.2d 157; Millard v. Maloney, D.C., 36 F.Supp. 41; Jes-

sie G. Brown, Ex'x, v. Com'r, 40 B.T.A. 934.

It is further argued that though § 302 (d) might be constitutionally applicable to a trust created prior to its enactment, if the power reserved is one that the decedent might have released after its enactment, thereby avoiding a tax, it would be a violation of the Fifth Amendment to apply § 302(d) in a case like the present because the power retained by Mrs. Chickering could not have been relinquished by her.

In Porter v. Commissioner, 60 F.2d 673, 675, the Circuit Court of Appeals for the Second Circuit pointed out that any possible constitutional difficulties were avoided because the power there retained by the donor could have been released after the enactment of § 302(d). Again, in Commissioner v. Chase National Bank, 2 Cir., 82 F.2d 157, 158, the same court referred to the fact that the decedent had "lived several years after the act took effect and she was on notice of its provisions, retaining the reserved powers when she might have given them up to rid her estate of this tax liability. So there has been no denial of rights under the Fifth Amendment." But the Supreme Court in affirming the Second Circuit in the Porter case made no mention of the releasability of the power as a vital factor in sustaining the tax. We doubt very much whether this makes any difference; it involves the questionable assumption that a person has a constitutional right to be afforded an alternative whereby a tax, otherwise unassailable, may be escaped.

However this may be, the argument falls to the ground because, as we understand it, Mrs. Chickering could clearly have released the reserved power by her unilateral act at any time before her death.

Petitioner asserts two grounds for the proposition that Mrs. Chickering could not have released the power:

■ First, it is said that the power is held in trust, and we are referred to In re Donne's Trusts, L.R. 1 Ir. 516. That was a power purely collateral; the donee of the power was not the settlor of the trust; and in view of the special circumstances and wording of the particular trust deed it appeared that the power was intended as a power in trust. In the case at bar, however, we see no basis for the contention that Mrs. Chickering's power was held in trust. No criteria are laid down for its exercise; nothing expressed in the deed, and nothing in the factual background against which the trust was created, points to such a conclusion. The power reserved to each grantor is not fiduciary in nature but "so much reserved by him out of the estate." West v. Berney, 1 Russ. & M. 431, 435. Such a power in gross reserved by the grantor out of the estate conveyed to trustees is clearly releasable by the grantor under the English decisions. See the annotations in 76 A.L.R. 1430. Presumably the Massachusetts law, which governs the trust in the case at bar, is the same. Langley v. Conlan, 212 Mass. 135, 98 N.E. 1064, Ann.Cas.1913C, 421. This case dealt with the extinguishment of a general power of appointment, but it relied on two English cases, In re Hancock, [1896] 2 Ch. 173, and Foakes v. Jackson, [1900] 1 Ch. 807, in both 'of which cases it was held that a special power in gross could be extinguished by the donee of the power.

■ Second, it is said that the power reserved by Mrs. Chickering was in conjunction with reciprocal powers reserved by the other settlors of the trust; that Mrs. Chickering could not have released her power of appointment since to do so would have been to "modify" the trust, which would require the assent of certain of the beneficiaries under Section Ninth of the trust deed. These beneficiaries, so it is argued, might be regarded as having an interest substantially adverse to any such modification since it would deprive them of the otherwise ever present possibility that Mrs. Chickering would eventually disinherit her son in their favor. Cf. Helvering v. Helmholz, 296 U.S. 93, 56 S.Ct. 68, 80 L.Ed. 76; White v. Poor, 296 U.S. 98, 56 S.Ct. 66, 80 L.Ed. 80. But we do not think that a relinquishment of the power by Mrs. Chickering would have been a "modification" of the trust within the meaning of Section Ninth of the trust instrument. A great many of the English cases permitting release of special powers involved trusts which contained no provision at all for amendment or revocation; and of course in most of them the release of the power must have been at least as disappointing to some of the objects as would have been the disappointment to the other beneficiaries of the William A. Russell Trust upon the release of Mrs. Chickering's power to disinherit her son in their favor. Since we hold that the powers were personal to the grantors, retained as it were for their own

benefit, we cannot see why a release of the powers should be regarded as a "modification" of the trust within the meaning of Section Ninth of the trust instrument any more than a renunciation by any beneficiary of some of his rights under the trust.

The decision of the Board of Tax Appeals is affirmed.